IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAUL MAZUR,

    Plaintiff,

v.

PACIFIC TELESIS GROUP
COMPREHENSIVE DISABILITY
BENEFITS PLAN, et al.,

    Defendants.

No. C 07-01904 JSW

**ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Now before the Court are the cross-motions for summary judgment filed by plaintiff Paul Mazur ("Plaintiff") and defendants Pacific Telesis Group Comprehensive Disability Benefits Plan ("Pacific Telesis Plan") and AT&T Umbrella Benefit Plan No. 1 ("Umbrella Plan") (collectively, "Defendants" or the "Plans"). The Court finds that this matter is appropriate for disposition without oral argument and it is hereby deemed submitted. *See* N.D. Civ. L.R. 7-1(b). Accordingly, the hearing set for April 24, 2009 is HEREBY VACATED. Having carefully reviewed the parties' papers, considered their arguments and the relevant legal authority, the Court hereby denies the parties' cross-motions for summary judgment.[1]

## BACKGROUND

This action arises from the denial of Plaintiff's claim for benefits under the Plan provided by his employer, AT&T Inc. ("AT&T"). Plaintiff brought this action to challenge the denial of his claim for disability benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

---

[1] Defendants' motion to file a sur-reply is DENIED.

The Pacific Telesis Plan is a program under the Umbrella Plan, which provides short term and long term disability benefits to eligible participants. The Pacific Telesis Plan defines short term disability as:

> a sickness, injury or other medical, psychiatric, or psychological condition, which prevents an Employee from engaging in his or her normal occupation or employment with the Participating Company, or other such occupation or employment as he or she is assigned in accordance with the Participating Company's normal practices.

(Administrative Record ("AR") 008.) If a participant does not return to work at the end of a fifty-two week period for which the short term disability benefits are payable because of a long term disability, the participant becomes eligible to receive long term disability benefits. (AR 014.) The Pacific Telesis Plan defines long-term disability as:

> a sickness, injury or other medical, psychiatric, or psychological condition, which prevents an Employee from engaging in any occupation or employment for which the Employee is qualified or may reasonably become qualified, based on training, education or experience ....

(AR 007.)

AT&T has an agreement with Sedgwick Claims Management Services, Inc. ("Sedgwick") which provides that Sedgwick shall serve as the claims administrator for the Pacific Telesis Plan. Sedgwick was the claims administrator for Plaintiff's claims. (AR 008, 147, 172-175, 228; Declaration of Nancy Watts, ¶¶ 8-9.)

Plaintiff began working for the Pacific Telesis Group as a Directory Sales Representative in 2002. (AR 304, 306, 471-72.) Plaintiff's position was a sedentary one, requiring him to talk with customers on the phone and type information into the company database. (AR 471, 478, 1083-84.) Plaintiff's employment was terminated effective September 29, 2006. (AR 323, 560.)

On August 25, 2005, Plaintiff stopped working and applied for short term disability benefits due to lower back pain. (AR 471, 905.) Plaintiff was diagnosed with acute exacerbation of chronic low back pain with radiculopathy secondary to degenerative disc disease. (AR 911, 916.) Sedgwick approved his initial application for short term disability benefits through September 12, 2005. (AR 478-79, 792, 905, 907, 910.)

2

The Pacific Telesis Plan provides that the claims administrator shall approve short term disability benefits whenever the claims administrator "concludes, on the basis of medical, psychiatric, or psychological opinion, that Short Term Disability is the cause of the Participant's absence from work ...."  (AR 021-020.)  In order to make the determination regarding whether Short Term Disability is the cause of the Participant's absence from work, the claims administrator "may require the Participant to submit an opinion of the Participant's treating physician or psychologist, or other evidence of Short Term Disability. ..."  (AR 020.)

The "Questions Most Commonly Asked" section of the Summary Plan Description informs Participants that:

> To make the case for disability, medical reports should answer the following questions, among others:
> •   What abnormalities or deficiencies exist?
> •   What treatment is being given?
> •   Have complications developed?
> •   What function is available despite the impairment?
> •   How is the impairment affecting other areas of the employee's life?
> ...
> ... Your treating practitioner's primary responsibility is to diagnose and treat your illness, something that can not be done at a distance.  He/she must also record information, both subjective and objective, and send it to [Disability Assistance Program.]

(AR 053-54.)  The Summary Plan Description further informs Participants that: "If you do not get proper medical, psychiatric or psychological treatment for the condition which causes your disability, benefits will not be paid."  (AR 051.)

On August 30, 2005, an examiner from Sedgwick called Plaintiff and informed him that he may be required to provide copies of his medical records and that his medical information was due by September 9, 2005.  The examiner further informed Plaintiff that claims without medical information supporting a complete inability to perform his assigned job duties by September 9, 2005 would be denied.  (AR 471, 473.)

On September 1, 2005, Plaintiff was sent a letter explaining that the medical information needed to substantiate his disability was due by September 9, 2006.  The letter further stated:

> ...It is important that both you and your treatment provider understand that these forms, along with chart notes, diagnostic test results, hospital summaries, etc. specifically related to the reason of your absence should be returned regardless

3

> of the length of your disability.  It is critical that your physician demonstrates by his/her observations and clinical findings that you are unable to perform your work with or without accommodations.  This is the information, which will allow the case manager to make a determination of your eligibility for benefit payments under the SBC Disability Plans.
> ... If the medical documentation received from your treatment provider does not contain information that establishes your condition prevents you from performing the duties of your job with or without reasonable accommodations, your claim will not qualify for benefit payments under the SBC disability plans.

(AR 1061-1062.)

On September 9, 2005, Plaintiff was left a voicemail message with "BA details" and advising him "of need for ongoing med ..." (AR 479.)  On September 12, 2005, Plaintiff was informed that his benefits were extended through September 18 and that if he was unable to return to work by September 19, 2005, his doctor would need to update "SMAART" with additional medical information." (AR 481-82, 1075.)

On September 16, 2005, Plaintiff was called again and advised that his benefits expired on September 18, 2005.  Plaintiff was advised that he would need "ongoing medical" in order to extend his benefits.  (AR 482.)  On September 16, 2005, Sedgwick received medical information for Plaintiff, but it was the same medical information that was received on September 8, 2005 and stated that Plaintiff could return to work on September 12, 2005.  (AR 482.)  On September 21, 2005, Plaintiff was denied short term disability benefits beyond September 18, 2005.  (*Id.*)

On October 10, 2005, Sedgwick received additional medical information regarding Plaintiff.  Dr. McNally listed October 7, 2005 as the last office visit.  Dr. McNally provided office visit notes from September 19, 2005, indicating that Plaintiff was "still unable to work secondary to pain." (AR 485.)  According to Dr. McNally, Plaintiff was not able to return to work until November 7, 2005.  (AR 486.)   Plaintiff's short term benefits were extended through November 6, 2005.  (AR 487, 1107.)  On October 10, 2005, Sedgwick called Plaintiff to inform him of the extension and to inform him of the need for updated information regarding his progress.  (AR 487.)  Plaintiff was advised that if was not able to return to work on November 7, 2005, he would need to obtain medical information to substantiate why he could not perform his regular job duties.  (AR 487.)

4

1   On November 4, 2005, Sedgwick received additional medical information from Kaiser
2   updating the estimated return to work date to be November 28, 2005, pending treatment and
3   recovery. (AR 488-89.) On November 7, 2005, Sedgwick adjusted Plaintiff's benefits and
4   extended his coverage through November 27, 2008. (AR 490.) On November 7, 2005,
5   Sedgwick sent a benefit extension letter to Plaintiff. (AR 918.)

6   On November 28, 2005, Sedgwick called Plaintiff and advised him that he had short
7   term disability benefits until November 27, 2005 and that if no additional "meds" were
8   received, Sedgwick may have to place his claim in denial status. (AR 490-91.) On December
9   6, 2005, Sedgwick sent Plaintiff a letter informing him that his short term disability benefits had
10  been denied effective November 28, 2005. (AR 492.) On December 16, 2005, Sedgwick
11  received a fax stating that Plaintiff would probably need to continue being off work for the next
12  few weeks. (AR 496.) On December 28, 2005, Sedgwick spoke with Plaintiff and Plaintiff said
13  he would send ongoing medical to support extending his benefits. Sedgwick received a fax
14  from Kaiser on December 28, 2005. Based on the information received from Kaiser, Sedgwick
15  extended Plaintiff's short term disability benefits to January 15, 2006. (AR 496-97, 946.)

16  After Sedgwick did not receive any additional medical information to support extending
17  short term disability benefits beyond January 15, 2006, Sedgwick denied Plaintiff benefits
18  effective January 16, 2006. (AR 500.) Sedgwick sent Plaintiff a letter dated January 18, 2006,
19  informing him of this denial. (AR 959-61.) The letter informed Plaintiff that in order for his
20  claim to qualify for disability benefits, Sedgwick:

> would need clear documentation from your provider(s) on why you are not able to perform the essential duties of your occupation. They would need to document your functional impairments as they relate to your diagnosis. They need to provide a treatment plan for returning you to work and reasonable restrictions with a reasonable duration. This information may be included in the following: chart of progress notes, specialist evaluations, diagnostic test results and/or any other medical information you feel supports your inability to work.

26  (AR 960.)

27  On February 2, 2006 Sedgwick received by fax an "EDD form" stating that Plaintiff had
28  acute exacerbation of chronic low back pain and that Plaintiff was diabetic." Plaintiff attended

5

1   low back classes and was continue to do so monthly as needed.  Sedgwick determined that the
2   fax had no impact on Plaintiff's claim because there was no information regarding his
3   "limitations when it comes to siting, talking and typing."  (AR 504.)  When Plaintiff called to
4   see if his fax was received, he was informed that the fax did not contain any updated "objective
5   meds."  (AR 504.)

6   On February 21, 2006, Sedgwick received a fax from Kaiser stating that Plaintiff's
7   prescriptions were refilled on December 13, 2005 and that on January 13, 2006 Plaintiff did not
8   feel that he could go back to work.  Plaintiff's pain was usually an "8" and on occasion went
9   down to "6.5."  Sedgwick determined that the medical information lacked "observed functional
10  limitations regarding [his] job duties" (AR 505.)

11  On March 15, 2006, Plaintiff called Sedgwick regarding his claim status and stated that
12  he had been referred to Kaiser's pain management program.  (AR 505.)  On March 15, 2006,
13  Sedgwick received an additional form from Kaiser stating that Plaintiff had chronic back pain
14  and lumbar fusion and that he could not return to work until June 9, 2006.  Sedgwick
15  determined that this additional information had no impact on Plaintiff's claim.  (AR 506.)

16  On April 3, 2006, Sedgwick informed Plaintiff that he needed medical information from
17  January 16, 2006 regarding his observed functional limitations.  (AR 507.)  Sedgwick received
18  a fax from Kaiser on April 3, 2006 with a note from Dr. McNally stating that Plaintiff is unable
19  to sit or stand for more than 15-20 minutes without intense pain.  Plaintiff needs to lay down for
20  about a half an hour to relieve the pain.  After three or four cycles, Plaintiff must lay down for
21  the rest of the day or the pain comes back immediately.  Due to this pain, Plaintiff is unable to
22  perform work duties.  (AR 507-508.)  Sedgwick determined that the information from Kaiser
23  did not support overturning the entire denial time frame and informed Plaintiff accordingly.
24  (AR 508.)  On May 5, 2006, Plaintiff appealed the denial and sent Sedgwick additional medical
25  information.  (AR 510.)  On May 18, 2006, Insurance Appeals, Ltd provided reports from the
26  four Independent Physician Advisors ("IPA").  (AR 514-515, 612-627.)

27  Dr. Phillip Jordan Marion, Board Certified in Physical Medicine and Rehabilitation and
28  in Pain Management, found Plaintiff was disabled from his regular job as of January 16, 2006 to

6

1  the present. Dr. Marion noted Plaintiff's "disabling diagnoses of chronic low back pain with
2  complicating factors including history of prior lumbar spine surgeries, multiple interventional
3  spinal procedures and including spinal cord stimulator insertion." Dr. Marion's rational for
4  finding that Plaintiff disabled was his inability to stand or sit for any length of time and the fact
5  that Plaintiff continued to complain of increasing pain severity, in spite of receiving ever
6  increasing dosages of narcotic opioid medications. (AR 614.) Dr. Marion found the clinical
7  findings described in Plaintiff's records were "clinically significant." (AR 615.) Dr. Marion
8  concluded that based on Plaintiff's clinical information, and without the benefit of examining
9  Plaintiff, anticipating the appropriate length of his disability was unclear at that time. (AR 615.)
10      Dr. Michael L. Levy, American Board Neurological Surgery, found that "strictly from a
11  neurosurgical perspective," Plaintiff was not disabled and that there was insufficient clinical or
12  objective evidence to support Plaintiff's inability to work for the dates in question. (AR 515,
13  618, 619.) Dr. Leonard Sonne, Board Certified in Internal Medicine, found that based on the
14  fact that Plaintiff has a sedentary job, "[f]rom an internal medicine perspective," there was no
15  documentation that he was disabled from his regular job. (AR 515, 612.)
16      Dr. Glenn D. Babus, American Academy of Pain Management, found that "from an
17  orthopedic perspective" Plaintiff was disabled from his regular job as of January 16, 2006 to the
18  present. (AR 515, AR 625.) Dr. Babus found Plaintiff was disabled based on the large amounts
19  of narcotics he was on. (AR 626.)
20      On May 19, 2006, Sedgwick overturned its decision to deny benefits and reinstated
21  Plaintiff's short term disability benefits from January 16, 2006 through May 28, 2006 based on
22  the following rationale:

23  medical documentation provided for review supports continued functional
    impairment that would preclude sedentary job function. [Plaintiff] is noted to be
24  treated for chronic pain syndrome relative to multiple back procedures. He is
    noted to continue to be unable to sit or stand for any length of time in spite of
25  ever increasing very high dosages of narcotic medications and spinal cord
    stimulator. He continues with poor response to treatment and the high dosages
26  of narcotic [*sic*] would preclude working.

27  (AR 516.) Sedgwick extended Plaintiff's short term disability benefits through May 29, 2006
28  due to a holiday. (AR 520.)

7

On May 26, 2006, Sedgwick called Plaintiff's doctor, Dr. Gelman, to request "ongoing medical." (AR 521.) On May 31, 2006, Plaintiff's supervisor called and stated that she believed the Plaintiff would go into long term disability and may never return to work. (AR 523.) On June 1, 2006, Sedgwick received a fax from Kaiser stating that Plaintiff was under the care of Dr. McNally and was unable to work through June 30, 2006 as he cannot sit, walk, or stand for more than thirty minutes at a time without a rest period. Sedgwick determined that the fax did not support extending Plaintiff's benefits because there were no objective findings to support the information. (AR 523.) However, the next day, Sedgwick found that based on Plaintiff's current medical information and the insurance appeal's report, Plaintiff's condition remained unchanged and he was unable to work. Sedgwick extended Plaintiff's short term disability benefits through July 2, 2006. (AR 523.)

In a letter dated June 5, 2006, Plaintiff was informed that he would need to send updated medication documentation, including chart notes, diagnostic test results, hospital discharge summaries, if he had not recovered sufficiently to return to work by July 2, 2006. (AR 1036.) On June 14, 2006, Plaintiff was called and reminded to have his records from Dr. Fritsch with the pain management clinic faxed over and that the last office visit from Mr. McNally needed to be submitted for the ongoing review. Plaintiff was told that an off-work note would not suffice. (AR 529.) On June 27, 2006, Sedgwick called Plaintiff and explained that his medical information was due by July 2, 2006. (AR 531.) On July 3, 2006, Plaintiff was left a voicemail message advising him that his claim was in denial status because no additional medical information was received. (AR 532.) Plaintiff was advised to submit documentation from his treating provider explaining why he is not able to perform the essential duties of his occupation and what his functional impairment is as it relates to his diagnosis. (AR 532.)

On July 24, 2006, Sedgwick received a fax with the report from Dr. Marvin Zwerin from SDI finding that Plaintiff cannot work. (AR 534-535.) On July 31, 2006, Plaintiff was left a voicemail message informing him that Sedgwick had still not received the notes from Dr. McNally from Kaiser or from Dr. Fritsch with the pain management clinic. (AR 537.) On August 1, 2006, Sedgwick called Plaintiff again to let him know that Sedgwick had still not

received the medical information from Kaiser. According to Sedgwick's files, Plaintiff stated that he had a "phone visit" with Dr. McNally and that he had seen Dr. Fritsch and that he had been trying to obtain those records but that he would be charged a fee for them. Plaintiff said that he did not think those records would be of any value. Plaintiff was told that the records from Dr. Fritsch would support that Plaintiff remains under care and treatment and would also provide information regarding how he was progressing with his pain management. Plaintiff stated that "he's not bothering with those records, he still does not think they have any value to the claim and it won't be held against him if he does not send them." Sedgwick informed Plaintiff that the report from Dr. Zwerin did not support providing benefits because it essentially covered findings consistent with Plaintiff's laminectomy in 1999, Dr. Zwerin made vocational statements which were outside of his expertise, and it did not provide any evidence that Plaintiff remained under the care of a doctor or of findings upon an examination since Dr. McNally's last update on June 1, 2006. (AR 539-540.)

On August 2, 2006, Sedgwick received a fax from Kaiser with an "off-work" form dated July 20, 2006. The fields for "diagnosis," "date the patient was last seen," and "treatment plan" were left blank. The only field completed was "restrictions," in which the following statement was written:

> [Plaintiff] suffers from lumbosacral neuritis with nerve damage. He suffers severe pain and is able to sit, stand, and walk for only 1/2 hour before pain becomes too much and he must lie down for 1/2 hour. He can do only 2 to 3 cycles of this per day or the pain becomes too much and he has too lie down the rest of the day.

(AR 542.) Sedgwick determined that this form did not support the reversal of the denied benefits from July 3, 2006 because the note did not contain any clinical data and it did not appear as though Plaintiff was seen on consultation or examined. (AR 542.)

On August 14, 2006, Sedgwick received Plaintiff's medical records from Kaiser from March 17, 2006 through August 9, 2006. According to Sedgwick, the majority of the records documented Plaintiff's participation in a Level 3 Intensive Chronic Pain Management program. (AR 543-559.) These records included an "off-work" note from Dr. McNally dated August 9,

9

1  2006, which stated that Plaintiff could return to work with no restrictions on October 3, 2006.

2  In the "restrictions" field, the note provided:

> [Plaintiff] suffers from lumbosacral neuritis with nerve damage. He suffers severe pain and is able to sit, stand, and walk for only 1/2 hour before pain becomes too much and he must lie down for 1/2 hour. He can do only 2 to 3 cycles of this per day or the pain becomes too much and he has too lie down the rest of the day. Therefore, he would only be able to spend a maximum of 2-2-1/2 [hours] a day at his desk."

(AR 543-544.) Sedgwick believed that Dr. McNally did not examine or treat Plaintiff when Dr. McNally wrote the "off-work" note. (AR 544.) Sedgwick determined that the "off-work" note did not contain any clinical data and was not representative of care and treatment as it was noted in April 2006 that Plaintiff's future contact with Dr. McNally would be by phone on August 8, 2006. Sedgwick further concluded that the statement that Plaintiff could only work for two to two and a half hours per day due to his need to lay down the rest of the day was inconsistent with Plaintiff's functionality demonstrated in the pain management program. (AR 559.) The documents also contained notes from a visit with Dr. Fritsch on July 5, 2006. Sedgwick determined that Dr. Fritsch's documentation of that visit did not have objective medical findings consistent with "TD," showed that Plaintiff was stable on medications, and that improvement was noted subjectively. (AR 559.)

The documents submitted by Plaintiff stated that he actively participated in a ninety minute group exercise routines and walks in late April and early May of 2006 during chronic pain group appointments and that Plaintiff was reducing the amount of medication he had been taking. (AR 732, 738, 741, 743, 748-49, 751-52, 754.)

As a prerequisite to receiving long term disability benefits, a participant must first receive fifty-two weeks of short term disability benefits. (AR 005, 014.) Because Plaintiff only received forty-four weeks of short term disability benefits and Sedgwick believed that he did not provide medical information to support extending such benefits, Sedgwick denied Plaintiff's claim for long term disability benefits. (AR 316-317, 324.) In a letter dated July 19, 2006, Plaintiff was informed that the reason his claim for long term disability was denied was because

1  his short term disability benefits were denied before the required fifty-two week period had
2  been completed. (AR 342-43.)
3        On November 29, 2006, Plaintiff appealed the denial of his claim for long term
4  disability benefits. (AR 358-359.) In connection with this appeal, Plaintiff submitted the
5  following medical documents: (1) a report from Dr. McNally dated November 1, 2006,
6  addressing AT&T's contention that a "sit to stand" station would allow Plaintiff to return to
7  work; (2) a letter dated November 1, 2006 from Dr. McNally, which is signed by Dr. Linda
8  Choe, a physical medicine and rehabilitation specialist at Kaiser Permanente, indicating her
9  agreement with Dr. McNally's findings and opinion; (3) a report from Dr. Zwerin dated July 24,
10 2006 on behalf of the California Employment Development Department ("EDD") in which Dr.
11 Zwerin concludes that Plaintiff is unable to return to work for the foreseeable time, is eligible
12 for long term disability benefits, and should apply for Social Security Disability; and (4)
13 treatment notes and letter reports from Kaiser Permanente that had already been provided by
14 Plaintiff. (AR 358-239.) The letter from Dr. McNally stated, in pertinent part:

> [Plaintiff] suffers from chronic, persistent and severe pain, caused by permanent damage to the nerves in his lower back, specifically the region of L5/S1 in the spinal column. ...
> He has been diagnosed with herniated nucleus pulposus, or permanent, unresolved pressure, bulging and leakage of multiple spinal discs which surgery was unable to remediate. The pain resulting from the diagnosis is, in fact, permanent and, due to its nature, is also not remediated enough for full-time work by frequent change of position.
> The nature of his injury means that he is unable to flex or extend his back within normal limits and, therefore, attempts to stand frequently, resulting in spasms. Remaining seated for long periods of time produce similar results. He has diminished sensory input as well as diminished reflexes, meaning that multiple changes in position from sit to stand will also result in delayed, severe pain.
> [Plaintiff]'s condition requires him not to sit OR stand for greater than thirty to forty minutes at a time, after which, a rest period of at least thirty minutes in a fully reclined position is required due to muscle fatigue and nerve pain. This cycle of work – rest can only be repeated for a total of three and four periods of thirty minutes each, before permanent fatigue and debilitating pain results.
> ...
> The "Sit to Stand" work station in no way addresses or eliminates the issues which make [Plaintiff] unable to return to his job.

(AR 810-811.)

11

On December 13, 2006, Plaintiff's counsel was informed that Plaintiff's claim for long term disability benefits was denied based on his failure to satisfy the fifty-two week waiting period, and thus, that the medical information submitted on appeal does not alter the denial. (AR 324.) On December 14, 2006, Plaintiff's counsel submitted an appeal of the denial of Plaintiff's short term disability benefits. (AR 443-444, 808-809.) Plaintiff's counsel argued that Plaintiff's short term disability benefits had been denied based on a misconception that Plaintiff could return to work using a "sit to stand" work station. (AR 443, 808.)

On January 4 and 10, 2007, Sedgwick called Plaintiff's counsel to discuss the appeal review and to go over the medical information in the file to determine if there was additional medical information available. Messages were left for Plaintiff's attorney. (AR 563.) On January 10, 2007, Plaintiff's attorney was sent a letter requesting that he call back regarding the appeal and informing him that the Appeal Specialist had some questions regarding Plaintiff's medical condition and treatment. (AR 564, 1079.) On January 12 and 18, 2007, Sedgwick called Plaintiff's counsel again and left voicemail messages. (AR 563-64.) The Appeal Specialist did not hear back from Plaintiff's attorney. (AR 564.)

On January 19, 2007, Sedgwick upheld the denial of Plaintiff's claim for long term disability benefits based on his failure to complete the fifty-two weeks of short term disability benefits. (AR 463-64.) In a letter dated January 29, 2007, Plaintiff's appeal of the denial of his claim for short term disability benefits was upheld. AT&T Integrated Disability Service Center Quality Review Unit and the independent physician advisors reviewed the medical records from Kaiser Permanente, Dr. McNally, James Ferandell, LCSW, Dr. Anne Kopp, Dr. Joe Persinger, Physical Therapist Renee Garvin, Dr. Chrsitina Fritsch, Dr. Mark Gelman, and Dr. Zwerin. (AR 899-900.)

Dr. Marcus J. Goldman, a specialist in psychiatry conducted a review of the medical records and noted that Plaintiff was diagnosed with adjustment disorder with depressed mood, mild. He further noted that there was no record of mental status examinations and no evidence that Plaintiff had been receiving treatment for a psychiatric condition of such severity that it

would have precluded him from working in his position on a full-time basis from July 3, 2006 to the present. (AR 899.)

Dr. Phillip Jordan Marion, a specialist in pain management who previously found Plaintiff was disabled, reviewed Plaintiff's medical records and noted Plaintiff's diagnoses of chronic low back pain, with history of lumbar spine surgery and spinal cord stimulator insertion. Dr. Marion noted that Plaintiff was functionally independent and did not have any evidence of neurological deficits. Dr. Marion also noted that the restrictions outlined by Plaintiff's physicians were inconsistent with the clinical records. Dr. Marion observed that Plaintiff was involved in a comprehensive pain management program and was reportedly performing a home exercise program independently. Moreover, Plaintiff was otherwise independent with activities of daily living and ambulation. Dr. Marion further noted that Plaintiff did not have any specific driving restrictions that would have been consistent with any specific cognitive deficits. Dr. Marion found that Plaintiff's subjective complaints were not substantiated by the clinical findings and that the medical documentation did not support the severity of his symptoms or his inability to perform his job duties. Therefore, Dr. Marion found that the file did not contain evidence of any specific acute pathology rendering Plaintiff disabled from performing the routine duties of his job from July 3, 2006 to the present. (AR 566, 900.)

Dr. Saad M. Al-Shathir, a specialist in Physical Medicine and Rehabilitation, upon review of Plaintiff's file, noted Plaintiff's diagnoses of chronic lumbar pain, residual L5 radiculopathy, opiate dependence, mechanical spine dysfunction and lumbar neuritis. Dr. Al-Shathir noted that Plaintiff's records did not contain documentation of significant clinical abnormality, neurological deficit, new imaging changes, or loss of function. Dr. Al-Shathir observed that Plaintiff was able to attend attend three hours of psychotherapy, exercise 60 to 90 minutes and do swimming therapy on Aril 25, 2006 and afterwards. Plaintiff also reportedly sat quietly and listened to three hours of a psychotherapy session. He further noted that the records provided no clinical evidence of functional impairment indicating that Plaintiff was unable to perform his sedentary job duties from July 3, 2006 to the present. (AR 566-567, 900.)

13

In the letter informing Plaintiff that his denial of short term disability benefits had been upheld on appeal, the appeal specialist wrote that Dr. Marion noted that Plaintiff "is functionally independent with no evidence of neurological deficits" and that "the restrictions outlined by [Plaintiff]'s treating physicians are inconsistent with clinical records." Therefore, Dr. Marion found that Plaintiff's "file did not contain evidence of any specific acute pathology rendering [Plaintiff] disabled." The appeal specialist further explained that Dr. Al-Shathir noted that Plaintiff's records "do not contain documentation of significant clinical abnormality, neurological deficit, new imaging changes, or loss of function" and "indicated that the records provided no clinical evidence of functional impairment that would have indicated [Plaintiff] was unable to perform his sedentary job duties." (AR 900.)

Plaintiff submitted a declaration in which he provides a description of, and his participation in, the Intensive Chronic Pain Program at Kaiser from April 24 through May 10, 2006. Each class lasted approximately three and a half hours with a thirty minute lunch break in the middle. (Declaration of Paul Mazur, ¶ 1.) During the first hour, there was a lecture and a group discussion. During this period, the participants were allowed to position themselves in any that was comfortable. The participants were provided with chairs, exercise balls, and floor pads. Typically, Plaintiff would start by sitting in a chair or on an exercise ball. However, after approximately fifteen or twenty minutes of sitting, Plaintiff would lie down on a floor pad on his back or side for the remainder the lecture. (*Id.*, ¶ 2.)

After the lecture and group discussion, the class would go on a walk for thirty minutes. Although Plaintiff could generally participate in most of the walk, he had to lie down again after the walk and would spend the lunch period lying down. (*Id.*, ¶¶ 3-4.)

After lunch, there was an hour of physical therapy exercises. The exercises primarily consisted of stretching and floor exercises during which the participants would either lie or kneel on the floor, stretch their backs, and do core strengthening techniques. Plaintiff was generally able to complete these exercises, which mostly involved lying or kneeling on the floor. (*Id.*, ¶ 5.)

1   The last hour of class consisted of relaxation techniques. Plaintiff was allowed to
2   position himself in any comfortable position, and for him, that was almost always lying on his
3   back on a floor pad. (*Id*., ¶ 6.)
4   After the class, Plaintiff would return home and spend the rest of the day either lying
5   down or reclining. He would avoid any prolonged sitting, standing or walking. (*Id*., ¶ 7.)
6   Although Plaintiff had been attempting to taper down his pain medications when he initially
7   started taking the classes, the activities he participated in during the class increased his pain.
8   Plaintiff was thus forced to take additional pain medications. (*Id*., ¶ 8.)
9   The Intensive Chronic Pain Program taught Plaintiff some exercises and relaxation
10  techniques to address his pain. Although Plaintiff believes that the classes provided him with
11  techniques to deal with the pain when it arose, enabling him to decrease to some extent his need
12  for pain medications, the classes did not increase his mobility or his ability to sit, stand or walk
13  more than when he started the classes. (*Id*., ¶¶ 9-10.)
14  The parties dispute whether Defendants erred when it determined that Plaintiff was not
15  disabled after July 2, 2006.

## ANALYSIS

**A.    Legal Standard on Summary Judgment.**

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary

15

1 judgment who does bear the burden of proof at trial, must produce evidence that would entitle
2 him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp.*
3 *Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

4 Once the moving party meets his or her initial burden, the non-moving party must go
5 beyond the pleadings and by its own evidence "set forth specific facts showing that there is a
6 genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving
7 party must "identify with reasonable particularity the evidence that precludes summary
8 judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to
9 "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v.*
10 *Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make
11 this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at
12 323.

13 An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact
14 finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49
15 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. "In considering
16 a motion for summary judgment, the court may not weigh the evidence or make credibility
17 determinations, and is required to draw all inferences in a light most favorable to the non-
18 moving party." *Freeman v. Arpaio*, 125 F.3d 723, 735 (9th Cir. 1997).

19 **B.  Standard of Review.**

20 ERISA allows a participant in an employee benefit scheme to bring a civil action to
21 recover benefits due under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B). Courts review a
22 denial of benefits challenged under § 1132(a)(1)(B) "under a *de novo* standard unless the
23 benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility
24 for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489
25 U.S. 101, 115 (1989). Where there is a proper grant of discretion, the deferential abuse of
26 discretion standard is triggered. *Metropolitan Life Ins. Co. v. Glenn*, __ U.S. __, 128 S.Ct.
27 2343, 2348 (2008); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999). Under
28 the *de novo* standard, "in considering motions for summary judgment, the district court must

decide whether there are genuine issues of material fact, not whether there was substantial or ample evidence to support the plan administrator's decision." *Mongeluzo v. Baxter Travenol Disability Benefit Plan,* 46 F.3d 938, 942 (9th Cir. 1995).

Here, the parties stipulated that the Court should review the denial of benefits for abuse of discretion, "subject to and as provided for by relevant Ninth Circuit authority, including but not limited to *Abatie v. Alta Health and Life Ins. Co.*, 458 F. 3d 955 (9th Cir. 2006)." (*See* Docket No. 22.) "If a benefit plan gives discretion to an administrator or fiduciary who is *operating under a conflict of interest*, that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion." *Glenn*, 128 S.Ct. at 2348 (emphasis in original, internal quotations omitted). Moreover, when a plan confers discretion on an administrator, if the plan administrator fails to comply with procedural requirements, that failure may, in some instances, warrant *de novo* review. *See, e.g., Abatie*, 458 F. 3d at 972; *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008).

> An administrator must provide a plan participant with adequate notice of the reasons for denial, 29 U.S.C. § 1133(1), and must provide a "full and fair review" of the participant's claim, *id.* § 1133(2); *see also* 29 C.F.R. § 2560.503-1(g)(1), (h)(2). When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures. Section 1133 requires an administrator to provide review of the specific ground for an adverse benefits decision. By requiring that an administrator notify a claimant of the reasons for the administrator's decisions, the statute suggests that the specific reasons provided must be reviewed at the administrative level. Moreover, a review of the reasons provided by the administrator allows for a full and fair review of the denial decision, also required under ERISA. Accordingly, an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA.

*Abatie*, 458 F.3d at 974 (internal quotation marks and citations omitted).

In the Ninth Circuit, "procedural violations of ERISA do not alter the standard of review [from abuse of discretion review to de novo review] unless the violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm." *Abatie*, 458 F.3d at 971 (internal quotation marks and citation omitted). Nevertheless, courts "may take additional evidence whenever '[procedural] irregularities have prevented the full development of the administrative record.'" *Saffon*, 522

17

F.3d at 873 n.2 (quoting *Abatie*, 458 F. 3d at 973). If the parties submit significant new evidence to the court, "it may be impossible for the court to grant *any* deference to the decision of the claims administrator, as that decision will perforce have been made without taking into account the new evidence." *Id*. at 873-74 (emphasis in original). Therefore, "as a practical matter" it may be unnecessary for the court to determine the degree of deference to give the claim's administrator's decision, "as the admission of significant new evidence will require a de novo reconsideration of the decision in any event." *Id*. at 874.

**C.     The Denial of Benefits Decision.**

The Court already found that Defendants' delegation of administration responsibilities to Sedgwick was insufficient to completely negate the existence of a structural conflict when it resolved the motion to allow discovery. The Court need not determine extent and effect of the conflict on the decision making process because, the Court finds that there was a procedural irregularity permitting the Court to consider the new evidence submitted by Plaintiff. Sedgwick provided a new reason for finding that Plaintiff was not disabled for the first time in its final decision denying short term disability benefits. *See Saffon*, 522 F.3d 871-82; *Abatie*, 458 F.3d at 974.

Notably, Sedgwick relied on the opinion of Dr. Marion when it decided to provide short term disability benefits until July 2, 2006. Dr. Marion's rational for finding the Plaintiff disabled was his inability to stand or sit for any length of time and the fact that Plaintiff continued to complain of increasing pain severity, in spite of receiving ever increasing dosages of narcotic opioid medications. (AR 614.) Presumably Dr. Marion relied on the opinion of Dr. Mcnally to make this finding. Dr. Marion found the clinical findings described in Plaintiff's records were "clinically significant." (AR 615.) However, after Dr. Marion reviewed Plaintiff's file containing notes that Plaintiff actively participated in ninety minute group exercise routines and walks in late April and early May of 2006 during chronic pain group appointments and that Plaintiff was reducing the amount of medication he had been taking, Dr. Marion changed his opinion and found that Plaintiff was not disabled. Dr. Marion found that the restrictions outlined by Plaintiff's physicians were inconsistent with the clinical records

18

1  regarding the pain management program and exercise conducted by Plaintiff.  Although just
2  several months prior he initially that the found that the clinical findings described in Plaintiff's
3  records were "clinically significant," Dr. Marion subsequently noted that Plaintiff was
4  functionally independent and did not have any evidence of neurological deficits.  Therefore, Dr.
5  Marion found that Plaintiff's subjective complaints were not substantiated by the clinical
6  findings and that the medical documentation did not support the severity of his symptoms or his
7  inability to perform his job duties.  (AR 566, 900.)

8       Plaintiff had not been informed that Sedgwick considered the notes regarding his
9  participation in the chronic pain program at Kaiser to contradict his treating doctors' restrictions
10 – the same restrictions that Dr. Marion, one of the Independent Physician Advisors, had relied
11 on to find that Plaintiff was unable to stand or sit for any length of time in May of 2006.
12 Despite Sedgwick's reported efforts to contact Plaintiff's counsel, the messages left and the
13 letter sent merely asked whether Plaintiff had any more medical information to submit.  Plaintiff
14 was not provided any indication that Sedgwick was planning on denying his short term
15 disability benefits because his records from his participation in the chronic pain program
16 conflicted with his doctors' restrictions.  *See Beckstrand v. Electronic Arts Group Long Term*
17 *Disability Ins. Plan*, 2008 WL 4279566, *8 (E.D. Cal. Sept. 16, 2008) (finding that calls asking
18 whether he had ever seen any therapist, psychologist or psychiatrist for treatment did not put the
19 plaintiff on notice that the Plan was no longer following its earlier finding that his medication
20 caused his symptoms or that the plaintiff needed to provide evidence of a mental health
21 diagnosis and treatment).  Therefore, the Court finds that Plaintiff was not provided adequate
22 notice of the specific reasons for the denial of his benefits.  Accordingly, the Court finds it
23 appropriate to consider the declaration submitted by Plaintiff in which he provides a description
24 of and his participation in the chronic pain program.

25      The consideration of this significant new evidence that was not before Sedgwick
26 requires the Court to engage in *de novo* review of the decision to deny benefits and, thus, as a
27 practical matter, it is unnecessary for the Court to determine the degree of deference to accord
28 Sedgwick's decision.  *See Saffon*, 522 F.3d at 874.  Under the *de novo* standard, "in considering

19

1  motions for summary judgment, the district court must decide whether there are genuine issues
2  of material fact, not whether there was substantial or ample evidence to support the plan
3  administrator's decision." *Mongeluzo*, 46 F.3d at 942.

4  Upon review of the administrative record, the Court finds that there are questions of fact
5  regarding whether Plaintiff is disabled under the terms of the Plan which preclude the Court
6  from granting either party's motion for summary judgment. The Court thus denies the parties'
7  cross-motions for summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court denies the parties' cross-motions for summary judgment. IT IS FURTHER ORDERED that the Case Management Conference scheduled for April 24, 2008 is VACATED.

Pursuant to Northern District Civil Local Rule 72-1, this matter is HEREBY REFERRED to a randomly assigned Magistrate Judge for purposes of conducting a settlement conference, to be completed within ninety days, if possible. In the event the parties are unable to resolve the matter, they are ORDERED to appear for a further case management conference on July 31, 2009 at 1:30 p.m. The parties shall submit a further case management statement by no later than July 24, 2009, setting forth proposed dates for the pretrial conference and trial. In their case management statement, the parties shall also propose a briefing schedule for submitting trial briefs. To the extent either party seeks to submit any additional evidence beyond the administrative record, they must make a showing that the circumstances demonstrate that the additional evidence is necessary for the Court to conduct an adequate *de novo* review of the benefit decision.

**IT IS SO ORDERED.**

Dated: April 20, 2009

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

20